# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MARGARET HOLCOMBE,
    Plaintiff,

    v.

INGREDIENTS SOLUTIONS, INC.,
    Defendant.

No. 3:17-cv-1090 (SRU)

## RULING ON MOTION TO DISMISS

Margaret Holcombe ("Holcombe") brought this action against her former employer,

Ingredients Solutions, Inc. ("ISI"), for breach of contract, breach of the covenant of good faith

and fair dealing, promissory estoppel, negligent misrepresentation, violations of the Connecticut

Unfair Trade Practices Act ("CUTPA"), and practices actionable under Conn. Gen. Stat. § 42-

482, *et seq*. Am. Compl, Doc. No. 27.  Holcombe's original complaint was filed on June 30,

2017.  Compl., Doc. No. 1.  ISI moved to dismiss the complaint, which I granted on December

11, 2017.  *See* Doc. Nos. 15, 23.  Thereafter, Holcombe filed an Amended Complaint in which

she raises the same claims against ISI.  *See* Am. Compl., Doc. No. 27. ISI filed a Motion to

Dismiss the Amended Complaint.  *See* Mot. to Dism., Doc. No. 30.  For the following reasons,

the Motion to Dismiss is **granted** and the amended complaint is dismissed with prejudice.


I.      **Background**

  A.  Factual Allegations in the Amended Complaint

Holcombe alleges the following facts in her Amended Complaint (Doc. No. 27).

Holcombe began working with ISI in 1999 as an independent sales representative for ISI's

carrageenan products.  Am. Compl., Doc. No. 27 at ¶¶ 18-19.  Carrageenan "is a common food

additive that is extracted from red seaweed … [and] is used as a thickener and emulsifier to

improve the texture of many processed foods." *Id*. at ¶ 6, n.1. ISI agreed to give her "full access to ISI documents and records regarding its carrageenan sourcing", and agreed to pay her "under the same plan or structure that applied to Frank Holcombe," Holcombe's father-in-law, who had worked for ISI in the same capacity as Holcombe. *Id*. at ¶¶ 16-17. Further, ISI agreed to pay her "4% of all revenue derived from sales to any customers [she] secured for ISI" and, in addition, "a base stipend" of $2,000 per month until her revenues grew. *Id*. at ¶ 20. That arrangement was "partially communicated" to her in an October 31, 2000 "proposal" from Scott Rangus, then-Vice President of ISI, "as well as verbally, in multiple oral communications" Holcombe had with Rangus and Donna Ravin, then-President of ISI. *Id*. at ¶ 21. ISI "assured [her] that the 4% of revenue 'from October 1, 2000 on' would be derived from sales to any customers that [Holcombe] secured for ISI, for as long as that customer continued purchasing carrageenan for the product lines [Holcombe] had participated in securing." *Id*. at ¶ 22. Further, "on various occasions from 2000-2012" Ravin "specifically represented and confirmed" to Holcombe that she "would continue to receive commissions on all sales ISI made to customers on product lines procured, regardless of whether [Holcombe] was in fact servicing the account at the time sales were made." *Id*. at ¶ 23. Holcombe "reasonably relied" on those representations when agreeing to work for ISI. *Id*. at ¶ 24. Further, "[h]istorically," ISI paid sales representatives, including her father-in-law, commissions "into their 70s and 80s (or until their death) in connection with sales made to customers they procured for accounts whenever secured, despite little or no activity." *Id*. at ¶ 25.

Holcombe procured for ISI numerous major customers, and those customers eventually accounted for $10 million in annual revenue for ISI, and two-thirds to three-quarters of all of ISI's carrageenan customers. *Id.* at ¶¶ 26-27, 38. Most of the customers Holcombe procured

received documentation related to ISI's carrageenan-sourcing, and most of those customers had strict requirements related to the specific identity or certification status of carrageenan sources for the products they purchased from ISI. *Id*. at ¶¶ 29-33, 37. Although some customers procured by Holcombe would engage in their own carrageenan-source inspection and testing, many simply relied on Holcombe's and ISI's assurances that ISI's sources complied with any relevant requirements. *Id.* Some customers procured by Holcombe even required her to "enter into contracts with them, including, but not limited to . . . nondisclosure agreements, code of ethics agreements, and letters of guarantees executed both by [Holcombe] and ISI" in which "ISI, and, in some cases, [Holcombe], were required to guarantee that the carrageenan . . . would not be adulterated or misbranded within the meaning of, inter alia, the" Food Drug and Cosmetics Act ("FDCA").[1] *Id.* at ¶ 42.

In entering into such contracts with customers, Holcombe relied on "promises and assurances made to her by ISI, as well as the written materials provided to her by ISI, in order to personally make such guarantees." *Id.* At unidentified times in their relationship, ISI, "through documents provided to [Holcombe] and promises made to [her] by Donna Ravin, Scott Rangus and others, assured [Holcombe] that the ISI carrageenan she represented would comply with" customer certification and supplier requirements, and applicable federal regulations. *Id.* at ¶¶ 34-36. Holcombe routinely requested and received documentation from ISI indicating appropriate compliance with customer and regulatory requirements. *Id.* at ¶¶ 39-41. Holcombe alleges that "from 2000-2012, [she] had no reason to believe that ISI was not abiding by the law or was not disclosing accurate information to her or [her] customers … regarding the source or quality of … carrageenan." *Id*. at ¶ 46.

---

[1] The FDCA "forbids the misbranding of food, including be means of false or misleading labels." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 105 (2014) (referencing 21 U.S.C. § 301, et seq.).

In 2012, Ravin retired as President/CEO and majority owner, titles that Rangus took over. Am. Compl., Doc. No. 27 at ¶ 47. At some point thereafter, and without her knowledge, ISI "began surreptitiously obtaining carrageenan from sources unapproved and untested by [her] customers." *Id*. at ¶ 48. ISI did not inform her of the changes, "purposely used product codes that were identical to" approved sources, continued to represent that the carrageenan sources were approved, and "provide[d] [Holcombe] with hundreds of documents in which ISI falsely certified the details" of the carrageenan sourcing. *Id*. at ¶¶ 49, 52. Holcombe "continued to rely on" ISI's inaccurate documents, representations, and certifications "throughout 2014 and 2015 when conducting her business, negotiating with and procuring customers for ISI." *Id*. at ¶ 53.

Beginning in 2014, Holcombe "became aware of major quality issues with one of ISI's flagship carrageenan products" and, when she asked ISI lab managers about it, they alleged that a "hot UPS truck" created the issues. *Id*. at ¶ 56. Around the same time, Holcombe's customers began complaining to her about the quality issues, "specifically taste and smell problems." *Id*. at ¶ 57. Holcombe requested sourcing information for that carrageenan product and learned that ISI had been sourcing carrageenan from "Accel" and other new plants for over two years without informing either Holcombe or her customers. *Id.* at ¶¶ 59-64, 83. Accel and many of the other new suppliers had no Global Food Safety Initiative ("GFSI") certifications and were not approved sources, although ISI was falsely representing to Holcombe that the pre-approved sources were being used. *Id.* at ¶¶ 64, 71, 73. ISI "was able to implement these fraudulent tactics since the only form of its carrageenan manufacturer identification is contained in . . . documents [that] ISI had stopped providing" to Holcombe. *Id.* at ¶ 65. ISI had "intentional[ly] attempt[ed] to mislead [Holcombe] and the customers with whom she worked . . . [by] provid[ing] documents to [Holcombe] which fraudulently included the same product codes used

by the new supply lines . . . as had been provided in connection with . . . approved suppliers . . . despite there being material differences in food safety, manufacturing site, country of origin, Kosher/Halal requirements and other quality concerns." *Id.* at ¶ 69. ISI's sourcing changes were "not only violating the promises and representations made to [Holcombe] that she would only be representing ISI carrageenan that complied with all applicable federal regulations, as well as the numerous specific mandates of the customers she represented, but ISI was also putting public health in jeopardy by not disclosing the true source of the carrageenan being supplied, thereby exposing [Holcombe] to adverse government action." *Id.* at ¶ 66.

ISI's use of Accel and other carrageenan suppliers "contravened … the representations and promises ISI made to [Holcombe] that the ISI carrageenan she represented would comply with customer mandates" and directly contradicted product materials that ISI gave her. *Id.* at ¶ 71. Further, Holcombe was denied access to documents about the new plants despite "having been promised and granted access to such documents in connection with different suppliers throughout the course of her relationship with ISI and in breach of the terms of its agreement" with her. *Id.* at ¶ 72, 74. Further, ISI provided her with a "bogus certificate" which purported to show that ISI had proper GFSI certification, and that she was told that ISI does not guarantee that "a given product comes from a specific plant", which she alleges conflicted with previous assurances she was given. *Id.* at ¶ 75-76. Holcombe informed ISI that she "could not knowingly participate in this ongoing wrongful activity by making false representations to the customers she represented." *Id.* at ¶ 79. "In an attempt to salvage her relationship with ISI," Holcombe offered to assist ISI in complying with federal regulations and customer specifications, but her offers were denied and she was told that ISI would follow the 'less said, the better policy.'" *Id.* at ¶ 80-81.

Rangus informed Holcombe that she should not be discussing carrageenan sourcing with her customers, as that would be "grounds for immediate dismissal" and that she could either "abide by" the rules or "move on." *Id.* at ¶ 82. She "had to make the choice of (a) participating in illicit behavior, (b) being dismissed by ISI for refusing to engage in such elicit behavior, or (c) terminating her representation of ISI." *Id.* Due to ISI's "breaches and misrepresentations," Holcombe alleges that she was "forced to walk away from her book of business and the goodwill she had accrued over 16 years", and "in an attempt to safeguard her business," she filed for an "expedited LLC and promptly ended her representation of ISI on February 1, 2016." *Id.* at ¶ 87. She "was left with no alternative but to abandon her ongoing book of business, leaving customers with whom she had longstanding relationships to speculate as to the basis for the sudden departure, thereby harming her goodwill and professional and ethical reputation in the industry." *Id.* at ¶ 88. ISI "failed to pay [her] commissions on sales made to, and revenues received from, the customers she procured, contrary to the terms of their contract, the specific promises, representations and assurances made to [Holcombe], and ISI's longstanding policy, custom and practice of paying its independent sales representatives ongoing commissions." *Id.* at ¶ 90. Holcombe alleges that although she expected commission revenues of $500,000 from ISI in 2016, she instead earned only $19,000 from the alternative sales representative position that she secured with W. Hydrocolloids. *Id.* at ¶ 89.

B. <u>Procedural History</u>

On June 30, 2017, Holcombe filed a complaint against ISI alleging six counts: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) promissory estoppel, (4) negligent misrepresentation, (5) violation of the Connecticut Unfair Trade Practices Act, (6) violation of Conn. Gen. Stat. § 42-482, *et seq. See* Compl., Doc. No. 1. The first five

counts each complained of both ISI's failure to pay Holcombe commissions on sales earned following her departure from ISI and ISI's alleged misdeeds relating to sales of improperly sourced carrageenan. The sixth count, brought under a statute that provides a mechanism to recover sales commissions, only addressed ISI's failure to pay commissions. ISI moved to dismiss the complaint on October 2, 2017. Mot. to Dism., Doc. No. 17.

At a hearing on December 11, 2017, I characterized Holcombe's claims in two categories: (1) Commissions Claims, allegations regarding ISI's failure to continue to pay Holcombe commissions on the customers she procured; and (2) Sourcing Claims, allegations regarding ISI's misrepresentations and breaches surrounding the sources of carrageenan manufacturing. Dec. 11 Tr., Doc. No. 26 at 2. With respect to the Commissions Claims, I stated that Holcombe had failed to sufficiently plead allegations that she was actually promised any type of ongoing commissions on sales made by ISI following her departure, and that Holcombe seemed to be alleging that she was entitled to the most extreme type of ongoing commissions—perpetual commissions for all sales to customers introduced to ISI by Holcombe—which was particularly implausible. *Id*. at 29-34. With respect to the Sourcing Claims, I stated that Holcombe had not established standing for the Sourcing Claims and, even if she had, she failed to properly plead a contract that included any sourcing-related agreements that ISI breached. *Id*. at 3-8, 13. Accordingly, I granted ISI's Motion to Dismiss and dismissed Holcombe's complaint without prejudice.

On January 1, 2018, Holcombe filed her Amended Complaint, pleading the same six counts against ISI as contained in her original Complaint: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) promissory estoppel, (4) negligent misrepresentation, (5) violation of the Connecticut Unfair Trade Practices Act, (6) violation of

Conn. Gen. Stat. § 42-482, *et seq*. Am. Compl., Doc. No. 27.  ISI moved to dismiss the Amended

Complaint on March 1, 2018.  Mot. to Dism., Doc. No. 30.  Holcombe opposed the motion to

dismiss (Opp. to Mot. to Dism., Doc. No. 31), and ISI filed a reply (Reply to Mot. to Dism., Doc.

No. 32)  I held argument on July 11, 2018 and took the Motion to Dismiss under advisement.

For the reasons that follow, ISI's motion is **granted** and Holcombe's Amended Complaint is

**dismissed with prejudice.**

## II.      Standard of Review

### A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v.*

*United States*, 201 F.3d 110, 113 (2d Cir. 2000).  A party that moves to dismiss for lack of

subject matter jurisdiction "may refer to evidence outside the pleadings." *Id.* (quoting *Kamen v.*

*American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)).  To survive a motion brought

under Rule 12(b)(1), a plaintiff "has the burden of proving by a preponderance of the evidence

that [subject matter jurisdiction] exists." *Id.* (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir.

1996)).

### B.  Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed

"merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which

might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch*

*Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d

636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

## III.  Discussion

Although the Amended Complaint again pleads six counts against ISI, I construe Holcombe's allegations similarly to those in the original complaint, as pleading two categories of wrongdoing: (1) the failure to pay commissions ISI allegedly promised her (the "Commission Claims") and (2) the failure to source carrageenan from appropriate suppliers or to properly document or disclose its carrageenan-sourcing practices (the "Sourcing Claims").

A.  Commissions Claims

In essence, the Commissions Claims stem from Holcombe's allegations that ISI promised to pay her commission on sales made to customers that she procured while working at ISI, regardless of whether or not she still worked there when the sale was made.  *See generally*, Am. Compl., Doc. No. 27.  Holcombe, however, fails to plausibly allege that ISI made any such promise and, further, fails to plead that there are any sales on which such perpetual commissions are owing.  As discussed more fully below, Holcombe fails to state a viable Commissions Claim with respect to any of the six independent counts in her Amended Complaint and, therefore, her Commissions Claims are dismissed with prejudice.

1.  *Count One – Breach of Contract*[2]

In her Amended Complaint, Holcombe appears still to be seeking perpetual commissions on sales made to customers procured by Holcombe for ISI.  *See* Am. Compl., Doc. No. 26 at ¶ 25 (describing ISI's history of paying commissions to sales representatives "in connection with sales made to customers they procured for accounts whenever secured").  Holcombe alleges that ISI agreed to pay her "4% of all revenue 'from October 1, 2000 on' … derived from sales to any customers that [she] secured for ISI" which she clarifies as "for as long as [a company she procured] continued purchasing [carrageenan], [Holcombe] was entitled to a 4% commission." Am. Compl., Doc. No. 27 at ¶ 22.  Holcombe's Commission Claim fails, however, because she has not sufficiently pled that there was any legally binding agreement to pay ongoing commissions, nor has she identified any particular breaches of such an agreement.

---

[2] Although Holcombe resides in Connecticut, ISI is located in Maine.  Because each of Holcombe's common law allegations fail for broad inadequacies common to both states' caselaw, a specific choice-of-law analysis is unnecessary.  Where useful, differences between the two states' legal regimes will nonetheless be pointed out.

The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages. *Meyers v. Livingston, Adler, Pulda, Meiklejohn and Kelly, P.C.*, 311 Conn. 282, 290 (Conn. 2014); *Tobin v. Barter*, 89 A.3d 1088, 1091-92 (Me. 2014) (plaintiff must establish a legally binding contract, a breach of a material term of that contract, and that the breach caused the plaintiff to suffer damages). With respect to commissions, courts have applied a presumption against post-termination commissions. *See, e.g.*, *Bentivegna v. People's United Bank*, 2017 WL 3394601, at *23 (E.D.N.Y. Aug. 7, 2017).

Holcombe seems to be relying, in part, on an October 31, 2000 letter that purportedly captures the parties' employment agreement in which ISI agreed to provide Holcombe "4% commission to be paid on all sales." *See* Doc. No. 22. Although Holcombe alleges that she had "multiple [additional] oral communications" from "2000-2012" in which ISI assured her that she would continue receiving commissions on all purchases made by the customers she procured, Holcombe fails to plead any specific communications or times at which ISI promised to pay commissions to Holcombe after she terminated her relationship with ISI. The same flaw resulted in dismissal of the original complaint. *See* Dec. 11 Tr. at 33-34 ("I don't see a document. I don't see an email exchange. I don't have the president of the company saying X, Y and Z on a particular date. I don't know what you want me to look at in deciding whether it's a plausible allegation that they entered into an agreement.").

In *Roberts Associates, Inc. v. Blazer International Corp.*, the Eastern District of Michigan held that language like that in the October 31, 2000 letter providing for commissions on "all sales" as opposed to "all sales to *customers* procured by plaintiff" could not be interpreted as allowing for post-termination commissions, merely because the plaintiff had originally procured

the customers. 741 F. Supp. 650, 653-655 (E.D. Mich. 1990). The *Roberts Associates* court left open the possibility that, in the unusual case, commissions could still be owed on specific sales that were *initiated* pre-termination, but *closed* post-termination without any additional intervening interaction between the customer and supplier, *id.* at 655, but Holcombe's Amended Complaint is not seeking compensation for that particular category of sales. The theory of Holcombe's Amended Complaint is that she is owed ongoing commissions for *all* sales made to certain customers, merely because she originally brought them to ISI. *See* Am. Compl., Doc. No. 27 at ¶ 23 (seeking commissions "on all sales ISI made to customers on product lines plaintiff procured, regardless of whether plaintiff was in fact servicing the account at the time sales were made").

Holcombe's claims are not aided by the surrounding terms of the October 31, 2000 letter, which suggest that commissions would be paid in tandem with salary (which does not extend past termination), and which also discusses terms such as "continu[ing] . . . reimburse[ment of] office and travel expenses." *See* Doc. No. 22. Despite the use of the word "continu[ing]", the October 2000 letter surely doesn't contemplate ongoing reimbursement of such expenses post-termination. Nor is Holcombe saved by vaguely referring to a "history, custom, policy and practice of paying its independent sales representatives for this revenue stream notwithstanding even minimal or no ongoing sales activity." Am. Compl., Doc. No. 27 at ¶ 24. Holcombe's suggestion that ISI continued to pay commissions to its representatives even when their ongoing sales lagged is irrelevant to the proposition that *former* sales representatives should continue to be paid ongoing commissions after quitting ISI. Further, Holcombe's allegations that ISI had a practice of paying commissions to sales representatives "into their 70s and 80s (or until their death) … despite little or no activity" does not support her claim that she is entitled to such

commissions. *Id.* at ¶ 25. First, there is no indication that any of those sales representatives quit ISI, as Holcombe did. Second, Holcombe acknowledges that in some cases the representatives were still active in procuring the sales. Accordingly, Holcombe cannot use that alleged "history, custom, policy, and practice" to bolster her own claims that she was entitled to commissions on sales after she quit ISI; sales that occurred without any sales activity by Holcombe.

Holcombe's far-fetched theory of entitlement to perpetual commissions for customers she procured for ISI (or perhaps, for sales made "on product lines [she] procured" Am. Compl., Doc. No. 27 at ¶ 23), is not supported in her Amended Complaint with allegations of any actual sales on which commission payments are outstanding.[3] For that reason too, Holcombe has failed to state a claim for unpaid commissions.

2. *Count Two – Breach of Implied Covenant of Good Faith and Fair Dealing*

Under Connecticut law, "every contract carries an implied duty 'requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement'." *De la Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432 (2004) (quoting *Gaudio v. Griffin Health Svcs Corp.*, 249 Conn. 523, 564 (1999)).[4] In other words, "[t]he covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *Keller v. Beckenstein*, 117 Conn. App. 550, 563 (2009).

---

[3] The problem of Holcombe's failure to plead any specific sales on which commissions are still owed is compounded by Holcombe's accompanying failure to clearly state the terms of ISI's commission obligations. At one point, Holcombe claims that, despite a general agreement to pay 4% ongoing commissions, "[c]ommissions were occasionally less, but only when negotiated in advance on an account-by-account basis." Am. Compl., Doc. No. 7 at ¶ 22. With no specific allegations regarding the sales or customers for which commissions remain owed, and no specific allegations regarding the commissions structures in place for those customers, it is doubly impossible to determine if there are outstanding commissions owed.

[4] Maine does not recognize a freestanding covenant of good faith and fair dealing. *Chartier v. Farm Family Life Ins. Co.*, 113 A.3d 234, 237 (Me. 2015).

Moreover, "to constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *De la Concha*, 269 Conn. at 433 (quoting *Alexandru v. Strong*, 81 Conn. App. 68, 80-81 (2004)). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake regarding one's rights or duties, but by some interested or sinister motive." *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 116 (D. Conn. 2014).

As a preliminary matter, Holcombe's claim of a bad faith deprivation of her right to receive post-termination commissions under her contract with ISI fails because she has failed to allege a contractual right to post-termination commissions, or a reasonable belief that she would receive such commissions. Holcombe's claim of a breach of the implied covenant of good faith and fair dealing also fails to plead any bad faith in the deprivation of post-termination commissions. Holcombe's conclusory citation to paragraphs 52 ("ISI also failed to deal with plaintiff in good faith by purposefully withholding commissions owed . . . .") and 53 ("ISI engaged in the foregoing conduct callously, willfully, and with deliberate disregard for plaintiff's rights under the agreement.") of her Complaint cannot suffice. *Calzone v. State Farm Fire & Cas. Co.*, 2017 WL 5013234, at *2 (D. Conn. Nov. 2, 2017) ("While Plaintiff uses the watchwords of *bad faith* in his complaint, he does not provide the requisite *facts* to "nudge [his] claim[ ] across the line from conceivable to plausible." (emphasis added)). The only facts suggestive of bad faith that Holcombe alleges relate to her Sourcing Claims, which cannot support a breach of the covenant of good faith and fair dealing here because those claims do not relate to any right to post-termination commissions.

3. *Count Three – Promissory Estoppel*

Holcombe's claim of promissory estoppel relating to her Commission Claims must also fail both because she has failed to plead the elements of such a claim and because the claim is entirely duplicative of her breach of contract claim. Under the doctrine of promissory estoppel, Connecticut courts will enforce "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance . . . if injustice can be avoided only by enforcement of the promise." *D'Ulisse-Cupo v. Bd. of Directors of Notre Dame High Sch.*, 202 Conn. 206, 213 (Conn. 1987) (internal quotation marks omitted). Thus, as Holcombe points out in her opposition, in order to plead promissory estoppel, Holcombe must show that ISI promised her post-termination commissions, reasonably expecting her to change her position in reliance on the promise, and that Holcombe indeed did so, incurring some injury. Opp. at 26 (quoting *Johnson v. Walden Univ., Inc.*, 839 F. Supp. 2d 518, 535 (D. Conn. 2011)).

First, to the extent Holcombe is seeking recovery under a theory of promissory estoppel for commitments she claims were captured in an enforceable contract, her promissory estoppel claim must fail. *Miller Auto. Corp. v. Jaguar Land Rover N. Am., L.L.C.*, 2010 WL 3260028, at *8 (D. Conn. Aug. 12, 2010) ("Connecticut courts presented with the same situation have held that incorporating paragraphs describing an enforceable contract renders a promissory estoppel claim invalid." (citing *Reynolds, Pearson & Company, LLC v. Miglietta*, 2001 WL 418574 (Conn. Super. Ct. Mar. 27, 2001))).

Assuming that Holcombe's promissory estoppel claim is not precluded by her contract claim, she has failed to properly plead the elements of promissory estoppel. As described above, Holcombe's allegations of contractual promises do not describe a commitment to pay post-termination commissions—and certainly not one on which it would be reasonable to rely. It is

15

also unclear what detrimental change of position Holcombe is alleging she undertook in reliance on the commission promises.  To the extent her argument (absent from either the Complaint or her opposition) is that she chose to accept employment at ISI due to the commission promises, she has failed to allege any more profitable opportunities that she thereby chose to forgo. *Ingram v. Rencor Controls, Inc.*, 217 F. Supp. 2d 141, 153 (D. Me. 2002).  Finally, although it is unclear how she might be able to characterize her departure from ISI as a detrimental change in position, to the extent she attempts to do so, even that argument fails in light of the structure of her Complaint, in which she claims she is entitled to the post-termination commissions regardless of her departure.

### 4.  *Count Four – Negligent Misrepresentation*

To state a claim for negligent misrepresentation, Holcombe must have alleged that ISI made a misrepresentation of fact that it knew or should have known was false, and that Holcombe reasonably relied on the misrepresentation, suffering pecuniary harm as a result. *Coppola Const. Co., Inc. v. Hoffman Enters. Ltd. P'ship*, 309 Conn. 342, 347 (2013). Holcombe's claim of negligent misrepresentation with respect to the Commission Claims fails for all of the same reasons as her preceding claims.  Holcombe has not alleged any statement by ISI that it would pay post-termination commissions outside of its contractual compensation commitment.  I have already determined that those statements were not commitments to pay post-termination commissions, and, second, they cannot serve as the basis for a duplicative negligent misrepresentation claim.[5]  Finally, Holcombe has failed to allege any facts from which it could be inferred that she relied on the commission representations to her detriment.

---

[5] The economic loss doctrine rules out simultaneous claims of breach of contract and negligent misrepresentation based on the same statements.  The Connecticut Supreme Court clarified in *Ulbrich v. Groth* that negligent misrepresentation claims are generally barred where they "are premised on the same alleged conduct" and "rely on

Holcombe argues that she "was forced to terminate her business relationship with ISI," and saw a dramatic drop in revenue, harm to her reputation, and exposure to legal liability. First, Holcombe's argument here fails because the misrepresentations she is claiming forced her to leave ISI relate to the Sourcing Claims, which are separate from her Commission Claims. Second, she cannot claim to have lost commissions as a result of her departure, because her Complaint, in paragraphs incorporated into her negligent misrepresentation claim (*see, e.g.*, Am. Compl. at ¶ 23), alleges that she is owed these commissions despite her departure. Third, to the extent that the harm to her reputation is properly considered to have resulted from ISI's representations, it is unclear whether reputational harm constitutes the sort of pecuniary harm needed to sustain a negligent misrepresentation claim. *Compare Indep. Ins. Serv. Corp. v. Hartford Life Ins. Co.*, 2006 WL 860676, at *3 (D. Conn. Mar. 31, 2006) (holding that plaintiff's allegation of substantial financial damage "as well as irreparable harm to its reputation" stated a claim of negligent misrepresentation), *with Kulas v. Adachi*, 1997 WL 256957, at *10 (S.D.N.Y. May 16, 1997) (dismissing a claim alleging pecuniary harm in the form of, inter alia, injury to business reputation). Certainly, unrealized criminal or civil liability does not yet constitute pecuniary harm, and the only reference in the Complaint to liability exposure contradicts Holcombe's argument by stating that she left ISI to *avoid* being a party to their alleged misdeeds, and thus avoided opening herself up to any ongoing legal consequences of ISI's alleged fraud.

5. *Count Five – Violation of Connecticut Unfair Trade Practices Act*

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Boulevard*

___

the same evidence" as a breach of contract claim. 310 Conn. 375, 405 (2013) ("More fundamentally, the plaintiffs have pointed to no theory under which they could prevail on their . . . negligent misrepresentation claim[] even if their breach of [contract] claim failed.").

*Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1038 (2d Cir. 1995) (quoting Conn. Gen. Stat. §

42-110b(a)). CUTPA provides a cause of action to "[a]ny person who suffers any ascertainable

loss of money or property" as a result of the deceptive act or practice. Conn. Gen. Stat. § 42-

110g(a). Holcombe's claims of violation of CUTPA are just as misplaced as her preceding

claims. Absent consideration of Holcombe's Sourcing Claims (which resulted in no harm to

Holcombe, as discussed below), Holcombe's conclusory CUTPA pleading amounts to an

allegation that ISI unfairly failed to pay her commissions owed under her contract. There is no

CUTPA violation for a mere breach of contract. *See Aztec Energy Partners, Inc. v. Sensor

Switch, Inc.*, 531 F. Supp. 2d 226, 232 (D. Conn. 2007); *A Slice of Pie Prods., LLC v. Wayans

Bros. Entertainment*, 392 F. Supp. 2d 297, 312 (D. Conn. 2005). I have already determined

above that ISI's agreement on commissions with Holcombe was not a commitment to pay post-

termination commissions, and thus its contractual commitment on this point (the only

commitment alleged by Holcombe) cannot have been unfair or deceptive. Holcombe has failed

to point to any other way in which her Commission Claims allege unfair or deceptive conduct.[6]

---

[6] ISI also argues that Holcombe has failed to plead any relevant trade or commerce in Connecticut, Mot. to Dism., Doc. No. 30 at 19-20 (citing *Reyes v. Vertical Retail Sols., LLC*, 2011 WL 1168820, at *1 (Conn. Super. Ct. Feb. 24, 2011)), and that disputes arising from contractual employment relationships are inappropriately plead as CUTPA violations. *Id.* at 20 (citing *Collins v. Gulf Oil Corp.*, 605 F. Supp. 1519, 1523 (D. Conn. 1985)). CUTPA is a cause of action for unfair or anticompetitive behavior affecting the marketing of goods or services in Connecticut, not company-internal disputes that happen to have a connection to Connecticut. *See Kelly v. Noble Env't Power, LLC*, 2009 WL 3087217, at *8 (Conn. Super. Ct. Sept. 2, 2009) ("While there may be disagreement as to whether these alleged CUTPA violations take place in the context of an employer-employee or independent contractor relationship, the primary focus of this court's analysis must be on whether, in the activities alleged, the defendant was acting as a competitor and took actions that harmed the plaintiff."). Moreover, Holcombe's Sourcing Claims, which are insufficiently connected with her Commission Claims, would likely not even alter this analysis, because Holcombe fails to allege that the alleged conduct underlying the Sourcing Claims affected Connecticut commerce.

6. *Count Six – Violation of Conn. Gen. Stat. § 42-482, et seq.*

Because, as set out above, Holcombe has failed plausibly to plead any right to ongoing commissions, her cause of action under Conn. Gen. Stat. § 42-482 for payment of such commissions must be dismissed.

*** 

For the reasons set forth above, Holcombe's Amended Complaint fails to state a claim for ongoing or perpetual commissions and, therefore, her Commissions Claims are dismissed with prejudice.

B. Sourcing Claims

In essence, Holcombe's Sourcing Claims stem from her allegations that ISI began sourcing carrageenan from unapproved sources without informing Holcombe and her clients, and, thereafter, continually misrepresented and/or lied about the carrageenan sources used. *See generally*, Am. Compl., Doc. No. 27. Holcombe, however, fails to plausibly allege that she was harmed by those practices and, further, fails to plausibly allege that ISI made any promise to source carrageenan in a specific way and/or to keep her informed about the status of the sourcing information. Accordingly, Holcombe's Sourcing Claims must be dismissed for two reasons: (1) she lacks standing to bring those claims; and (2) even if she has standing, she fails to state a viable Sourcing Claim.

1. *Standing*

Holcombe must demonstrate standing for each claim and form of relief sought. *Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir. 2010). Holcombe will only have Article III standing to pursue her Sourcing Claims if she can show (1) that she suffered an injury in fact— that is, "an invasion of a legally protected interest which is (a) concrete and particularized . . .

and (b) actual or imminent, not conjectural or hypothetical"; (2) that there was a "causal connection between the injury and the conduct complained of"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision". *Id.* at 225 (internal quotation marks omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). She has failed, however, to establish that she suffered any injury from the alleged wrongful conduct regarding sourcing.

Holcombe's primary claim of harm is unpaid commissions. In her Amended Complaint, Holcombe has added allegations that she has been deprived of goodwill with existing customers and the opportunity to earn commissions on sales to customers that are locked into their relationships with ISI. Holcombe has failed, however, to plead any connection between her Sourcing Claims and any lost commissions, or any other injury. Her argument can best be characterized as follows: Once aware of ISI's allegedly fraudulent sourcing behavior, Holcombe chose to leave ISI, and her departure caused her to miss out on commissions she claims she is owed for sales made after her departure to customers she procured while with ISI. *See generally*, Am. Compl., Doc. No. 27.

That argument must fail. As a preliminary matter, Holcombe cannot plausibly allege that she missed out on commissions because the conduct underlying the Sourcing Claims forced her to quit. Holcombe alleges she is owed those commissions *despite* the fact that her relationship with ISI ended. *See* Am. Compl., Doc. No. 27 at ¶ 90 ("After plaintiff terminated her relationship, ISI failed to pay plaintiff commissions on sales made to, and revenues received from, the customers she procured, contrary to the terms of their agreement and ISI's longstanding policy, custom and practice of paying . . . ongoing commissions."). In other words, the crux of Holcombe's Complaint is that ISI contracted, covenanted, promised, or

misrepresented that they would pay her the commissions she is seeking even after she left the company. Thus, Holcombe's decision to leave (which she claims was itself caused by the Sourcing Claims) cannot be, by her own admission, what caused her to be deprived of any commissions.

Even if Holcombe had properly alleged that her departure caused her to miss out on certain commissions, there is an irremediable failure in the other link of her argued chain of causation: Her decision to leave ISI represents a superseding act that prevents the lost commissions from being "fairly traceable" to the Sourcing Claims. *McConnell v. FEC*, 540 U.S. 93, 228 (2003) ("[Plaintiffs' injury] stems not from the operation of [the challenged legislation], but from their own personal 'wish' not to solicit or accept large contributions, *i.e.*, their personal choice. Accordingly, the . . . plaintiffs fail here to allege an injury in fact that is 'fairly traceable' to [the legislation]."), *overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010); *see also Blomquist v. Washington Mut.*, 2008 WL 5233864, at *3 (N.D. Cal. Dec. 15, 2008) ("When an alleged injury results from a plaintiff's voluntary decision to abstain from certain activity, rather than engaging in the allegedly wrongful act itself, it is not 'fairly traceable' to the challenged conduct."). To the extent Holcombe suggests that she did not *choose* to quit, but was instead forced by ISI's improper sourcing behavior to quit, the allegations in the Complaint fail to meet the standard for a constructive discharge—that ISI "intentionally created a work atmosphere so intolerable that [the employee] is forced to quit involuntarily." *Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010) (noting that "disagreements with assigned duties and 'business judgments' of employer cannot even remotely be described as intolerable" (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325-26 (2d Cir. 1983)); *Exum v. U.S. Olympic Committee*, 389 F.3d 1130, 1136 (10th Cir. 2004) (holding that, confronted with

instructions to participate in unethical behavior, plaintiff could have "chosen to comply with his superior's order or, alternatively, refused to comply and faced the possible consequences of that choice").

Holcombe's implied covenant of good faith and fair dealing, promissory estoppel, negligent misrepresentation, and CUTPA claims related to her Sourcing Claims must all fail for the same reason.  As outlined above, each of those causes of action requires Holcombe to have suffered some loss, but Holcombe has failed to allege any harm to herself resulting from ISI's alleged sourcing misdeeds.  To the extent Holcombe is alleging that the breach of any sourcing promises resulted in lost commissions owed under the contract, her Sourcing Claims are just cumbersome versions of her Commissions Claims. To the extent Holcombe is attempting to plead additional lost commissions that she could have earned after she left, her claims fail because such harm is the result of her departure, and, ISI can neither be deemed responsible for her departure, nor responsible with providing her employment opportunities for any set amount of time, in light of their at-will employment arrangement.

Finally, Holcombe fails to plausibly allege that she has lost goodwill as a result of ISI's sourcing behavior.  Holcombe appears to suggest that she could not defend her reputation or appropriately explain her departure to her customers out of a fear of slander lawsuits from ISI. *See* Dec. 11 Tr., Doc. No. 26 at 12; Am. Compl., Doc. No. 27 at ¶ 87 ("[Holcombe] was afraid of ongoing personal, professional and financial retaliation by ISI. . . . [C]ustomers with whom she had longstanding relationships [were left] to speculate as to the basis for [her] sudden

departure.").)  However, Holcombe does not actually provide any allegations regarding concrete harm to her goodwill or reputation.[7]

Because Holcombe has failed to plead any injury in fact which can be traced to her Sourcing Claims, she lacks standing and, therefore, her claims must be dismissed.[8]

## IV.    Conclusion

Because Holcombe has failed to state her Commission Claims and because she lacks standing to bring her Sourcing Claims, ISI's Motion to Dismiss (Doc. No. 30) is **granted** and the Amended Complaint is **dismissed with prejudice**. The clerk is directed to close this case.

So ordered.

Dated at Bridgeport, Connecticut, this 27th day of March 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge

---

[7] Curiously, Holcombe claims that she could not tell customers the truth regarding her departure from ISI for fear of slander lawsuits, but the truth is a complete defense to slander.  A desire to avoid slander suits cannot justify Holcombe's alleged failure to salvage her goodwill by explaining her departure to her customers.
Further, Holcombe alleges that "due to the failure of ISI to grant [her] access to documents and records pertaining to the sourcing, quality and supply of its carrageenan" she, "was placed in a quandary in approaching specific customers to explain why her relationship with ISI ended." Am. Compl., Doc. No. 27 at ¶ 87.  That allegation is at best confusing, and, at worst, belies all of Holcombe's Sourcing Claims, which depend on her representing that ISI has indeed engaged in sourcing practices that contravene the requirements of actual customers.  Nor is it plausible that Holcombe cannot provide any superficial explanation to customers she would like to lure away from ISI without the documents she is seeking.  Particularly in light of the thirty-six pages of allegations of wrongdoing she has included in her Amended Complaint.  To the extent she is claiming that ISI has failed to make it easier for her to compete with them by providing additional documentation of her wrongdoing to use after she quit, they owe her no such duty.
[8] Because Holcombe does not have standing to assert her Sourcing Claims, I need not consider ISI's alternative claim that Holcombe's Amended Complaint fails to state a claim.